[Civ. No. 1932. Fourth Appellate District.—August 29, 1935.]

M. F. COELHO, Appellant, v. WILLIAM C. TRUCKELL et al., Respondents.

·Thomas F. Lopez and G. L. Aynesworth for Appellant.

Whitehurst & Logan and Hawkins & Hawkins, as *Amici Curiae* on Behalf of Appellant.

Roger R. Walch, District Attorney, for Respondents.

MARKS, Acting P. J.—This is an action to enjoin defendants from enforcing the provisions of an ordinance of the county of Kings making all of that county a voluntary tuberculosis control area, providing for the giving of the tuberculin test to all dairy cattle, and for the branding and slaughtering of reactors. Plaintiff is a dairyman who sues for himself and for more than ninety fellow members of the Kings Dairymen's Protective Association. Defendant William C. Truckell is the livestock inspector of Kings County and a resident and elector thereof. Defendant M. G. Smith is a duly qualified veterinarian and an employee of the bureau of animal industry of the United States, as is W. W. Worcester, both of whom are empowered to enforce the provisions of the ordinance in question. Neither are residents nor electors of Kings County.

In 1933 the legislature adopted an Agricultural Code for this state. (Stats. 1933, p. 60.) Article III, containing sections 221 to 254, inclusive, provides in detail for the control of bovine tuberculosis in California under the general direction of the Department of Agriculture of the state. It is only necessary for us to give a general summary of some of the provisions of this portion of the code. It is provided that the Department of Agriculture, which we will refer to as the department, may establish and maintain tuberculosis control areas. Each area shall consist of one or more counties. The director of the department may order cattle in a tuberculosis control area to be tuberculin tested whenever he considers it necessary. Those found to be reactors are to be branded and slaughtered after their value has been fixed by appraisement. It is contemplated that the state and federal governments will contribute towards compensating the owner for the loss suffered by him through the slaughtering of his cattle. It is provided by section 238 that ''No animal shall be tested or slaughtered under the provisions of this article unless: (a)

Funds are available from an appropriation of the United States to assist in the eradication of tuberculosis in cattle in California. (b) Funds are available from an appropriation of this State for payment of the indemnity by the State under the provisions of this article." When state funds are not available for administration purposes, and to pay owners indemnity for slaughtered cattle, the director of agriculture may withdraw one or more counties from tuberculosis control areas. A county thus withdrawn forms a provisional control area and no indemnity can be paid in such county to owners of reactors to the tuberculin test. In such areas the test is to be given only upon written requests of owners and it is provided that reactors shall be removed within thirty days after being tested. Provision is also made for the formation of calf segregation areas and regulation of the same.

Section 234.25 of the Agricultural Code provides as follows: "In any county which has not been established by the department as a tuberculosis control area as provided in the preceding section, the board of supervisors of such county may, by ordinance, declare any portion of said county a voluntary tuberculosis control area, for the purpose of eradicating bovine tuberculosis therein; the same to continue, as such, only until the department shall establish such county as a tuberculosis control area.

"The county live stock inspector shall, subject to the supervision of the director, examine and tuberculin test all dairy cattle within such voluntary tuberculosis control area, as often as may be deemed necessary, in order to determine which animals are affected with tuberculosis.

"The board of supervisors of such county shall provide by ordinance for the formation, regulation and operation of all such voluntary tuberculosis control areas, as may be so established within such county, necessary to accomplish the object of this section. The provisions in this code for payment of indemnity shall not apply to any voluntary tuberculosis control area established by authority of this section."

Kings County was not formed into a tuberculosis control area.

On November 5, 1934, the board of supervisors formed all of Kings County into a voluntary tuberculosis control area. The provisions of this ordinance follow quite closely the provisions of the Agricultural Code which provide for the govern-

ment and regulation of tuberculosis control areas by the state. It is provided that the testing of cattle for tuberculosis shall be done by "a bureau veterinary inspector, a cooperating regularly employed state or county veterinary inspector or an accredited veterinarian". The definitions of the terms of the ordinance as contained therein follow quite closely the definitions contained in section 221 of the Agricultural Code.

It is admitted that Kings County has provided no money to pay owners anything to recompense them for loss occasioned by the slaughtering of reactors and that no state funds can be used for that purpose. The ordinance under attack here contemplates that such owners will receive their sole compensation from federal funds available for the purpose of stamping out bovine tuberculosis in California. Counsel agree that if any money is to be paid to Kings County owners of slaughtered animals, the amount per animal of equal grade will be considerably less than that paid owners in tuberculosis control areas administered by the state. While it is admitted that a large sum of federal money is available for the purpose of paying for reactors slaughtered in tuberculosis control areas where the state contributes towards compensation for the loss to owners, counsel cannot agree upon the question of whether or not any of the federal funds can be used to compensate owners for loss in a voluntary tuberculosis control area such as Kings County where neither the state nor the county pays any portion of the loss. From the view we take of the case we regard this question as unimportant and will therefore assume that no compensation will be paid any owner for reactors slaughtered in Kings County.

The most serious attack on the Kings County ordinance is made upon the ground that it denies to the owners of bovine reactors in Kings County the equal protection of the laws guaranteed by the fourteenth amendment to the federal Constitution and those provisions of section 21 of article I of the state Constitution which prohibit the granting of special privileges and immunities to one citizen or class of citizens that are not granted to all citizens or classes of citizens. It is argued that because the owners of bovine reactors in Kings County, a voluntary tuberculosis control area, will receive no compensation for their slaughtered cattle and the owners of bovine reactors in tuberculosis control areas of the state will receive substantial compensation for the cattle slaughtered, this

amounts to denying the owners in Kings County the equal protection of the laws and constitutes the grant of a privilege to owners of infected cattle in tuberculosis control areas outside of Kings County which is not given to owners of the same class of cattle in Kings County, a voluntary tuberculosis control area.

It is well established that the provisions of the fourteenth amendment to the federal Constitution do not prohibit a state or one of its political subdivisions, in the exercise of its police powers and in the protection of public life, health, morals or safety, from passing a law affecting the property rights of individuals and even destroying their property if the law equally affects all within a given class. In *Barbier* v. *Connolly*, 113 U. S. 27 [5 Sup. Ct. 357, 28 L. Ed. 923], it is said: "The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws', undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness, and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses.

"But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity." (See, also, *Soon Hing* v. *Crowley*, 113 U. S. 703 [5 Sup. Ct. 730, 28 L. Ed. 1145];

*Yick Wo* v. *Hopkins,* 118 U. S. 356 [6 Sup. Ct. 1064, 30 L. Ed. 220, 221]; *Crowley* v. *Christensèn,* 137 U. S. 86 [11 Sup. Ct. 13, 34 L. Ed. 620]; *Murphy* v. *California,* 225 U. S. 623 [56 L. Ed. 1229, 32 Sup. Ct. 697, 41 L. R. A. (N. S.) 153]; *Adams* v. *Milwaukee,* 228 U. S. 572 [33 Sup. Ct. 610, 57 L. Ed. 971]; *Lawton* v. *Steele,* 152 U. S. 133 [14 Sup. Ct. 499, 38 L. Ed. 385]; *Northwestern Laundry* v. *Des Moines,* 239 U. S. 486 [36 Sup. Ct. 206, 60 L. Ed. 396].)

The provisions of section 21 of article I of the state Constitution have been similarly construed. In *In re Weisberg,* 215 Cal. 624 [12 Pac. (2d) 446], it is said: "The classification created for the purpose of legislation must, of course, be a reasonable one. It must not be arbitrary. . . . It is not the rule that all laws shall be universal or general in their application. It is sufficient that laws of a general nature have 'a uniform operation'. A law is general and uniform and affords equal protection in its operation when it applies equally to all persons embraced within the class to which it is addressed, provided that such class is founded upon some natural or intrinsic or constitutional distinction between the persons composing it and others not embraced in it. (*In re Sumida,* 177 Cal. 388, 391 [170 Pac. 823].)" (See *In re Stoltenberg,* 21 Cal. App. 722 [132 Pac. 841]; *In re Stoltenberg,* 165 Cal. 789 [134 Pac. 971].)

Where a measure is adopted to promote the public health or safety it is concededly an exercise of the police powers of the state. (*In re Johnson,* 40 Cal. App. 242 [180 Pac. 644]; *In re Yun Quong,* 159 Cal. 508 [114 Pac. 835, Ann. Cas. 1912C, 969].) In *Lawton* v. *Steele, supra,* the Supreme Court of the United States said: "The extent and limits of what is known as the 'police power' have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the state may order the destruction of a house falling to decay, or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and

other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. (*Barbier* v. *Connolly,* 113 U. S. 27 [5 Sup. Ct. 357, 28 L. Ed. 923] ; *Kidd* v. *Pearson,* 128 U. S. 1 [9 Sup. Ct. 6, 32 L. Ed. 346].) To justify the state in thus interposing its authority in behalf of the public, it must appear—first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.''

█ It is universally held that in the exercise of its police power the state may destroy private property without compensation where it is dangerous to life, health, or property. (*Patrick* v. *Riley,* 209 Cal. 350 [287 Pac. 455] ; *Graham* v. *Kingwell,* 218 Cal. 658 [24 Pac. (2d) 488] ; *Adams* v. *Milwaukee, supra; Miller* v. *Schoene,* 276 U. S. 272 [48 Sup. Ct. 246, 72 L. Ed. 568] ; *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306 [53 L. Ed. 195, 29 Sup. Ct. 101, 15 Ann. Cas. 276] ; *Arbuckle* v. *Pflaeging,* 20 Wyo. 351 [123 Pac. 918] ; *Schulte* v. *Fitch,* 162 Minn. 184 [202 N. W. 719] ; *Knox County* v. *Kreis,* 145 Tenn. 340 [236 S. W. 1] ; *Carstens* v. *De Sellem,* 82 Wash. 643 [144 Pac. 934] ; *Hacker* v. *Barnes,* 166 Wash. 558 [7 Pac. (2d) 607, 80 A. L. R. 1212] ; *State* v. *Heldt,* 115 Neb. 435 [213 N. W. 578] ; *State* v. *Main,* 69 Conn. 123 [37 Atl. 80, 61 Am. St. Rep. 30, 36 L. R. A. 623] ; *New Orleans* v. *Charouleau,* 121 La. 890 [46 So. 911, 126 Am. St. Rep. 332, 15 Ann. Cas. 46, 18 L. R. A. (N. S.) 368] ; *Durand* v. *Dyson,* 271 Ill. 382, [111 N. E. 143, Ann. Cas. 1917D, 84].)

█ In view of the foregoing well-established principles of law it seems clear that the Kings County ordinance in question here does not violate any of the provisions of the

fourteenth amendment to the federal Constitution nor those of section 21 of article I of the state Constitution. Bovine tuberculosis is dangerous to the health of humans and it is regarded as communicable to other cattle. (*Patrick* v. *Riley, supra.*) The matter of its prevention and eradication in dairy herds is well within the police powers of the state or county. Tubercular cattle in Kings County could be destroyed without compensation to the owners under the authorities already cited. ■ The ordinance in question was applicable to every owner of dairy cows within that county. It was, therefore, a general law, uniform in its operation as it applied equally to all persons embraced in the class to which it was addressed and that class was founded upon a natural, intrinsic and constitutional distinction between the persons composing it and others not embraced in it. (*In re Weisberg, supra.*) That it applied only to dairymen in Kings County and not to others in other counties is no objection to its constitutionality on the grounds we are now considering. A county ordinance is only effective within the boundaries of the county. If it applies equally to a class within the county it is not unconstitutional because it does not affect others of a like class without the county. "Any county . . . may make and enforce within its limits all such . . . police, sanitary, and other regulations as are not in conflict with general laws." (Sec. 11, art. XI, Const.)

■ Plaintiff urges that as the state has adopted a general plan for the eradication of bovine tuberculosis under its police powers, the legislature cannot authorize boards of supervisors to pass, and such boards under the police powers given counties cannot pass, ordinances on the same subject or in conflict with the state law. In support of this argument he cites section 11 of article XI of the Constitution; *In re Pfahler,* 150 Cal. 71 [88 Pac. 270, 11 Ann. Cas. 911, 11 L. R. A. (N. S.) 1092]; *In re Mingo,* 190 Cal. 769 [214 Pac. 850].

This argument is not tenable and the authorities cited are not applicable to the situation before us. The provisions of the Agricultural Code relating to the eradication of bovine tuberculosis by state officers are expressly made applicable only to those counties of the state organized into tuberculosis control areas by duly authorized state officers. We are informed that fifteen counties have been placed in such areas.

Had the board of supervisors of any one of these counties attempted to pass an ordinance covering the same ground as the state law or contrary to its provisions then plaintiff's argument would be sound and his authorities applicable. Kings County was never a tuberculosis control area. It was thus excluded from the operation of the general terms of the act as administered by state authorities. It therefore appears that the county ordinance was neither in conflict with the state law nor covered a subject already covered by state legislation.

Plaintiff urges that the state cannot pass a law providing that the owners of diseased cattle in some counties should be compensated for those slaughtered and deny like compensation to the owners of diseased cattle slaughtered in other counties. As we read the Agricultural Code it attempts no such thing. That code is effective only in those counties established as tuberculosis control areas by state officers. Only in those counties can cattle be slaughtered under its terms. Owners in those counties receive similar compensation for slaughtered cattle. Section 234.25 of the Agricultural Code gives a county not established as a tuberculosis control area the *option* of organizing a voluntary tuberculosis control area. There is nothing in the act to compel any county to organize such an area, the action being left to the discretion of the board of supervisors and, through the power of initiative and referendum, to the electors of the county. Kings County elected to avail itself of the privilege given it by the Agricultural Code of organizing a voluntary tuberculosis control area and its board of supervisors passed the requisite ordinance which is now in effect. Its voluntary tuberculosis control area is organized under this ordinance and governed by its terms and not under the general provisions of the Agricultural Code. Section 234.25 of that code is the only one applying to Kings County and then only as it authorizes the board of supervisors to organize the voluntary tuberculosis control district. District or area plans of eradication of bovine tuberculosis have been held valid in other states. (See *Fevold* v. *Board of Supervisors*, 202 Iowa, 1019 [210 N. W. 139]; *Schulte* v. *Fitch*, *supra*.) As the state law for the tuberculin testing of cattle and the slaughtering of reactors with provisions for compensation to owners does not apply to Kings County and as the Kings County ordinance

is not effective outside that county, the two enactments are not conflicting.

Plaintiff calls our attention to section 238 of the Agricultural Code which we have already quoted, and maintains that as this section prohibits the slaughtering of cattle "under the provisions of this article" unless there are both state and federal funds available to pay indemnity to the owners of the cattle, and it is admitted that no state funds are available to pay for any cattle slaughtered in Kings County, the act prohibits the slaughtering of any cattle there.

It is true that section 234.25 of the Agricultural Code authorizing the formation of voluntary tuberculosis control areas is in the same code article as section 238. The last sentence of section 234.25 provides that "the provisions in this code for payment of indemnity shall not apply to any voluntary tuberculosis control area established by authority of this section". We think the true meaning and fair construction to put upon section 238 is that it prohibits the slaughter of cattle in tuberculosis control areas unless the required funds are available, but has nothing to do with cattle slaughtered in voluntary tuberculosis control areas which are organized by ordinance which need not necessarily follow the other provisions of the Agricultural Code. The cattle in Kings County will be slaughtered under the provisions of its ordinance and not under those of the Agricultural Code. If the ordinance did not require the slaughtering of infected cattle, they could not be slaughtered because the general provisions of the code have not been made applicable to that county. By holding that the provisions of section 238 of the Agricultural Code apply only to the slaughter of cattle in tuberculosis control areas operating under state law and not to voluntary tuberculosis control areas operating under county ordinances we may give full effect to the provisions of that section and those of the last sentence of section 234.25 of the same code.

Plaintiff urges that the ordinance is void as it attempts to vest authority to execute its terms in the representatives of the federal bureau of animal industry none of whom are residents or electors of Kings County and therefore not qualified to become officials or deputies of officials of that county. This argument cannot apply to defendant William C. Truckell, who is the livestock inspector and a resident and elector of the county of Kings. The bureau of animal in-

dustry is willing to permit its employees to assist the state and county officials in eradicating bovine tuberculosis. The two mentioned in the agreed statement of facts, being the only federal employees with whom we are concerned, are regular veterinarians and qualified to administer tuberculin tests. We can see no good reason why they should not be permitted to assist the officials of Kings County in making such tests. It should be no more necessary for them to be officers or deputies of officers of the county in order to enable them to administer tuberculin tests than it should be necessary for a duly licensed physician to be a health officer or a deputy in order that he may be permitted to diagnose the case of a patient and determine that he is suffering from a contagious disease and should be quarantined.

■ *Amici curiae* argue that the Kings County ordinance and section 234.25 of the Agricultural Code are void as they leave to the designated veterinarians the duty of determining when and how often the tuberculin test shall be administered. They maintain that this involves a legislative act that cannot be delegated by the board of supervisors. This contention is without merit. In *Gaylord* v. *City of Pasadena,* 175 Cal. 433 [166 Pac. 348], in considering a similar question it was said: ''Even a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs—national, state, and municipal—and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are intrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For, as the Supreme Court of the United States declares: 'Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon

which the enforcement of its enactment depends, would be ''to stop the wheels of government'' and bring about confusion, if not paralysis, in the conduct of the public business.' (*Union Bridge Co.* v. *United States,* 204 U. S. 364 [27 Sup. Ct. 367, 51 L. Ed. 523].)'' (See, also, *Hacker* v. *Barnes, supra; North American Cold Storage Co.* v. *Chicago, supra; Richter* v. *State,* 16 Wyo. 437 [95 Pac. 51]; *Arbuckle* v. *Pflaeging, supra; New Orleans* v. *Charouleau, supra.*)

 *Amici curiae* urge that as section 234.25 of the Agricultural Code authorizes the board of supervisors of a county not a tuberculosis control area to ''declare any portion of said county a voluntary tuberculosis control area'' there is no authority to declare all of the county such an area. From this they argue that as the Kings County ordinance declares all of that county a voluntary tuberculosis control area it is void.

In construing the words ''any bonds'' as used in section 30 of the Street Improvement Act of 1913 (Stats. 1913, p. 954) it was said: ''The words *'any* bonds', as here used, undoubtedly mean *'all* bonds' not disposed of at the advertised sale. There are instances, and this plainly is one of them, where the word 'any' is properly construed to mean 'all'. See note to *State* v. *Kansas City,* Ann. Cas. 1916E, p. 8.'' (*Powell* v. *Allan,* 70 Cal. App. 663, at 668 [234 Pac. 339].) See, also, *Glen Alden Coal Co.* v. *City of Scranton,* 282 Pa. 45 [127 Atl. 307]; *Harper* v. *Consolidated Rubber Co.,* 284 Pa. 444 [131 Atl. 356]; *In re Schuster's Will,* 111 Misc. 534 [181 N. Y. Supp. 500]; *Klotz* v. *First Nat. Bank,* 78 Ind. App. 679 [134 N. E. 220]; *Harrington* v. *Interstate Business Men's Acc. Assn. of Des Moines,* 210 Mich. 327 [178 N. W. 19]. We believe that the fair construction to be placed on the words ''any portion'' as used in this section of the Agricultural Code will permit the organization of all of a county into a voluntary tuberculosis control area should its board of supervisors so elect.

Judgment affirmed.

Jennings, J., concurred.

Barnard, P. J., being absent, did not participate herein.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 28, 1935.

Thompson, J., voted for a hearing.